UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **COREY SMITH, a/k/a "BLACK" and "BLACKIE,"** | ) | CRIMINAL NO. 04-10111-MEL |
| | ) | |
| Defendant. | ) | |

### GOVERNMENT'S SENTENCING MEMORANDUM

Now comes the United States of America, by and through the undersigned counsel, and submits herewith the Government's Sentencing Memorandum with respect to defendant Corey Smith ("Smith"). The government submits that a sentence within the Guidelines Sentencing Range ("GSR") applicable to Smith (100-125 months) is a reasonable sentence for the reasons set forth below.

**1.   The GSR Applicable to Smith (18 U.S.C. §3553(a)(4)-(5):**

In <u>United States v. Booker</u>, 125 S.Ct. 738, 767 (2005), the Supreme Court made the U.S. Sentencing Guidelines ("the Guidelines" or "the USSG") advisory but also made it clear that district courts "must consult those Guidelines and take them into account when sentencing" (citing 18 U.S.C. §3553(a)(4), (5)). While Section 3553(a) identifies other sentencing factors as well, the government submits that, in arriving at an appropriate and "reasonable" sentence for any particular defendant, it makes sense to start with an analysis and understanding of the sentence recommended under the Guidelines. This is so for several reasons.

First, a sentence within the applicable GSR reflects the federal courts' collective sentencing expertise accumulated over the past two decades and therefore should carry considerable weight

with any sentencing court.  Second, the Sentencing Commission designed the Guidelines, and the sentences prescribed thereunder, to reflect many of the other sentencing considerations enumerated in 18 U.S.C. §3553(a), such as the seriousness of the offense, at least certain offender characteristics, the need to promote respect for the law, to afford adequate specific and general deterrence, and to ensure that defendants who deal drugs receive similar sentences.  See 18 U.S.C. §§3553(a)(1)-(4), (6).  Thirdly, the Guidelines provide a well-considered, time-tested, systematic and orderly framework within which to evaluate most, if not all, of the factors pertinent to any sentencing decision.

Smith stands convicted of distributing, or aiding and abetting the distribution of, crack cocaine, a highly addictive and dangerous drug, on at least six separate occasions.  He did so not only in an area of Boston which had been designated as a "hot spot" due to the high incidence of drug trafficking and associated crimes of violence, but he did so in close proximity to a middle school.  On at least one occasion, he was standing in a housing development playground when he yelled to Jermaine Anderson, the actual seller of the crack cocaine in that instance, "to make sure that Officer Brito was not a police officer . . . ."  PSR at ¶18.[1]  All told, Smith is criminally responsible for the distribution of 14.25 grams of crack cocaine --  more than twice as much as one co-defendant,

---

[1] The playground in question appears to be owned and operated by the Warren Gardens housing development, which is privately owned, and the enhanced penalties applicable under 21 U.S.C. §860(a) may not apply to privately owned playgrounds.

Jermaine Anderson (who was given a 46-month sentence) and almost five times as much as his other co-defendant, Alfred Ryan (who was given a 57-months sentence).

### (a) **Smith's role in the offenses of conviction**

In his objections to the PSR and in his own sentencing memorandum ("Def. Sent. Mem."), Smith contends that he should be given a two-level reduction due to his allegedly minor role in the offenses of conviction. Smith asserts that he personally, and without the assistance of anyone else, sold only $30 worth of crack cocaine to an undercover agent (Def. Sent. Mem. at 2, citing PSR ¶ 25) and that, "[i]n most of the transactions, [he] would simply direct the buyer or agent to the individual doing the actual selling" (Def. Sent. Mem. at 5, citing PSR ¶¶ 18, 21, 37 and 48). However, Smith's argument conveniently glosses over several important aspects of his offense conduct.

In the first place, the law recognizes that concerted or conspiratorial criminal activities such as those of which Smith stands convicted present a greater danger to society than the acts of solitary individuals acting alone. Secondly, Smith showed himself to be a savvy drug dealer, cautioning (advisedly, as it turned out) a co-defendant during the very first of the deals with which Smith is charged to make sure that the purchaser was not an undercover officer. Thirdly, Smith cannot be said to have been a minor actor in the offense conduct where, as here, he played a "but-for" role. For instance, during the most active phase of the Warren Gardens investigation, no controlled purchases were made

from Smith's co-defendant, Alfred Ryan. PSR at ¶ 3. It was not until the very end of that phase of the investigation, in late November, 2003, that an undercover officer made two controlled purchases of crack cocaine from Alfred Ryan **because Smith had reached out to Ryan and had acted as the intermediary**. PSR at ¶¶ 40-50. In short, the government submits that the Probation Office was correct in concluding that Smith has not and cannot meet his burden of establishing that he was less culpable than his co-defendants and less culpable than most other defendants convicted of similar crimes. PSR at p. 45.

### (b) Smith's criminal history

Smith's criminal history score also is significantly higher than that of his co-defendants. Anderson had just 3 criminal history points (CHC II) and Ryan, if not viewed as a career offender[2], had 6 criminal history points (CHC III). Smith, by contrast, has 11 criminal history points, including 2 for committing the instant offenses within just a few months of his discharge from incarceration. PSR at ¶¶ 75 and 77. This capped a disturbing and consistent pattern of committing one crime after another, regardless of the breaks accorded him by the state criminal justice system.

Smith's second adult offense was committed just six months after his first and while he was participating in a diversionary, pre-trial probation program in the wake of the first arrest. PSR

---

[2] Although the government argued that Ryan should be sentenced as a career offender, this Court gave Ryan a sentence at the high end of the GSR applicable to Ryan based on his unenhanced criminal history score (CHC III).

at ¶¶ 70-71.  Even though he was given a suspended sentence, it took Smith just two months to get caught committing his third adult crime, and just two months more to get caught committing his fourth adult crime.  PSR at ¶¶ 72-73.  Six months later, he was arrested again and eventually sentenced to a 90-day sentence.  PSR t ¶ 74.
 A year later (and less than a year before the instant offense conduct), he was convicted of possessing with intent to distribute marijuana and was given a two-year sentence, most of which was suspended until he violated his probation a mere month later.  PSR at ¶ 75.  It was soon after Smith's release from that period of incarceration that he was caught selling crack cocaine in the Warren Gardens area.

   Notwithstanding Smith's conclusory assertions to the contrary (Def. Sent. Mem. at 5), the government submits that Smith's 11 criminal history points do not overstate his criminality in light of his history of stubborn and escalating recidivism.  Given Smith's presentation of his criminal history, the Court also should be aware of the fact that Smith is suspected of having committed murder.  A confidential source has told members of the Boston Police Department that Smith and Tyrone Pierce shot and killed Michael Tavares in the Copeland Street area (across from Warren Gardens) in August, 2000; that Tyrone Pierce told the confidential source that Tyrone Pierce and Smith had decided to rob Michael Tavares (who sold a particular brand of juice drink on the street) of money and a gold chain and that, in the process of doing so, Smith had shot and killed Michael Tavares.  The Boston Police

Department believes that Tyrone Pierce left the Commonwealth of Massachusetts and may be residing either in the South or on the West Coast. The Boston Police Homicide Squad credits the information provided by the confidential source and, apparently is not alone in believing that Smith was involved in the Tavares homicide. Members of the Boston Police Department's Youth Violence Strike Force report that, in the wake of the Tavares homicide, persons associated with Smith began referring to him as "C-Murder" and as "Killer."

    **(c)** **Post-offense rehabilitation**

Smith argues that he should get a lower sentence than that called for under the Guidelines (Def. Sent. Mem. at 4) because he successfully completed a roughly eight-month residential drug treatment program (PSR at ¶¶ 107-108). In the first place, Smith has shown no connection between his use of marijuana (or his occasional use of alcohol or his weekend use of ecstasy before he went "clubbing") and his past or present criminal conduct. PSR at ¶¶ 105-106. In fact, the government seriously questions whether a defendant's marijuana use can be said to contribute to his other criminal conduct any more than, say, a desire to "make a quick buck." In any event, "[d]rug or alcohol dependence is not a reason for a downward departure" even though "[s]ubstance abuse is highly correlated to an increased propensity to commit crime." U.S.S.G. §5H1.4 (Policy Statement); 18 U.S.C. §3553(a)(5)(sentencing courts to consider any pertinent policy statement issued by the Sentencing Commission).

Smith understandably wishes to cast the results of his treatment in the light most favorable to him. However, in doing so, he distorts the facts. For instance, he was not "the recipient of the 'Most Improved' client award" while at Spectrum House. Def. Sent. Mem. at 4. Rather, he was "the recipient of the 'Most Improved' client **of the month** award." PSR at ¶ 107 (emphasis added). While he successfully completed the program, he was not able to reside in a sober house for three weeks thereafter without violating its rules and, within a month of entering the sober house, his compliance with the terms of his release was so deficient as to warrant his return to custody and his detention until sentencing. PSR at ¶ 108. To the extent Smith can be construed as seeking a departure from the USSG based on this record, it is a far cry from being so extraordinary and unusual as to take him outside the "heartland" of cases involving defendants who participate in post-arrest substance abuse treatment programs.

Thus, employing traditional Guidelines analysis and precedent, there is no basis for adjusting Smith's sentence below or otherwise departing from the otherwise applicable GSR of 100-125 months.

    **2.   <u>Smith's Arguments for Deviating from the USSG:</u>**

        **(a)   <u>The Nature and Circumstances of the Offense (18 U.S.C. §3553(a)(1):</u>**

As already noted, the USSG themselves and the analysis set forth above already take into account the nature and circumstances of Smith's offense conduct. However, Smith urges this Court to consider the disparity in sentencing for crimes involving crack

cocaine compared to those involving cocaine powder -- a factor which is not cognizable under the Sentencing Guidelines and which, therefore, can only be viewed as a basis for "deviating" from the Guidelines (as distinguished from departing pursuant to the Guidelines from the otherwise applicable GSR). The government submits that Smith's argument is based on unsubstantiated hyperbole and, at best, identifies an issue for consideration by policy makers, not jurists sworn to enforce the laws which exist.

Smith concedes, as he must, that no court of appeals has found the disparity in punishment applicable to crack cocaine versus cocaine powder to be unconstitutional. See United States v. Singleterry, 29 F.3d 733, 739-741 (1st Cir. 1994) ("the district court correctly concluded that 'Congress had before it sufficient . . . information to make distinctions that would justify . . . more severe sentences for trafficking in or using cocaine base or crack than cocaine itself'")(citation omitted); and United States v. Graciani, 61 F.3d 70, 74-75 (1st Cir. 1995)("We have squarely rejected claims that the conversion formula [equating one kilogram of crack cocaine to one hundred kilograms of powdered cocaine for sentencing purposes] has a greater impact on African-Americans, and, thus, transgresses the Equal Protection Clause of the Fifth Amendment")(citations omitted).

Nor is there any basis whatsoever for Smith's outrageous assertion that "there is little question that [this disparity in sentencing] is selectively enforced against African-American offenders." Def. Sent. Mem. at 2-3. In fact, one of the cases

cited by Smith specifically rejected a defendant's allegation of racially selective enforcement. United States v. Dumas, 64 F.3d 1427, 1431-32 (9th Cir. 1995)(concluding there was no basis for Dumas' "contention that in the Eastern District of Washington the decision to prosecute federally is made on the basis of race").[3]

In the post-Booker context, it also is important to keep in mind that the disparity in sentencing for crack cocaine compared to cocaine is not a creation of the Sentencing Guidelines, but is dictated by statute. Compare, e.g., 21 U.S.C. § 841(b)(1)(A)(ii) with 21 U.S.C. § 841(b)(1)(A)(iii); and see United States v. Eirby, 262 F.3d 31, 40-41 (1st Cir. 2001) ("The statutes criminalizing drug trafficking and the ancillary sentencing guidelines admittedly attach much harsher penalties to the distribution of cocaine base than to the distribution of like quantities of powdered cocaine")(citations omitted).

Smith quotes the Sentencing Commission's Fifteen Year Report to the effect that the impact of sentencing offenders differently for crack cocaine offenses than for powder cocaine offenses "'should be carefully considered by policymakers . . . .'" Def. Sent. Mem. at 3. With all due respect to this Honorable Court, this Court does not sit and is not constitutionally empowered to act as a "policymaker." As this Court's colleagues on the First Circuit Court of Appeals observed in the Singleterry *case:*

---

[3] The other case cited by Smith, United States v. Armstrong, 48 F.3d 1508, 1514 n. 1 (9th Cir. 1995), purported to lower the threshold for making a *prima facie* case of selective prosecution, but was reversed by the Supreme Court, 517 U.S. 546.

> [a]lthough Singleterry has not established a constitutional violation, he has raised important questions about the efficacy and fairness of our current sentencing policies for offenses involving cocaine substances. **We leave the resolution of these matters to the considered judgment of those with the proper authority and institutional capacity.**

29 F.3d at 741 (emphasis added). See also Eirby, 262 F.3d at 41 ("although we recognize the severity of the penalty paradigm vis-a-vis crack cocaine, we must uphold it").

Finally, the government notes that this Court deviated from the Guidelines when sentencing both of Smith's co-defendants, Jermaine Anderson and Alfred Ryan. However, in doing so, and in enumerating the *pros* and *cons* militating in favor or against a Guidelines sentence, this Court did not cite or allude to the disparate sentencing schemes applicable to crack cocaine and powder cocaine. The government submits that it would defeat another key sentencing factor -- "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (18 U.S.C. §3553(a)(6) -- were this Court now to deviate from Smith's GSR on such a basis.

### (b) Characteristics of the defendant (18 U.S.C. §3553(a)(1):

The government submits that the Sentencing Guidelines already take into account the salient "characteristics of the defendant." However, Smith argues that he should get a sentence well below the applicable GSR due to "Lack of Youthful Guidance." Def. Sent. Mem. at 5. In support of that argument, Smith provides only the following cursory information:

10

> Mr. SMITH has a limited 10th grade education. He came from a broken family, living with his father who always worked. He was not close to his mother who didn't want to be "stuck" with two children. PSR ¶s 92, 109.

Def. Sent. Mem. at 5.

However, Section 3553(a)(5) also directs sentencing courts to consider "any pertinent policy statement" issued by the Sentencing Commission and U.S.S.G. §5H1.12 cautions that "[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted." The government submits, therefore, that lack of guidance as a youth should not be considered by this Court as a basis for deviating below the otherwise applicable GSR. The policy statement embodied in U.S.S.G. §5H1.12 represents the considered judgment of the Sentencing Commission after evaluating myriad individual characteristics of criminal defendants and how they were reflected in sentencing decisions. Clearly, most offenders can find something in their backgrounds to suggest that they suffered from a lack of guidance in their youth, just as a great many law-abiding citizens managed to overcome a similar lack of guidance. Under these circumstances, to give any weight to such a factor would undermine the sentencing objectives of promoting respect for the law and affording adequate deterrence. 18 U.S.C. §3553(a)(2)(A) and (B).

It would be even more inappropriate to deviate from the USSG based on a lack of guidance as a youth where, as here, there is nothing remarkable, let alone exceptional, about the hardships experienced by a defendant during his formative years. Smith's

parents separated when he was a toddler, but it is by no means unusual for a child to be raised primarily by one parent. PSR at ¶ 92. Smith cites the fact that his primary caregiver, his father, "always worked" as though that represents some kind of hardship. Def. Sent. Mem. at 5. However, the Probation Office reported that information to make it clear that, even according to Smith, "there was never a time that his family was without basic necessities." PSR at ¶ 93. So, this is not a case of a defendant who was raised in grinding poverty. Nor, according to Smith's own interview with Probation, was he the victim of any domestic violence or "physical, sexual or emotional abuse" in the home. PSR at ¶ 93. So, far from suffering from a lack of guidance as a youth, Smith was raised by father who provided a good role model as a hard-working and caring parent.

In an "everything-including-the-kitchen-sink" argument typical of over-reaching defendants in a post-<u>Booker</u> era, Smith also makes the absurd argument that he deserves a lower sentence because "he was shot in the chest and suffered a collapsed lung several months prior to the instant offense." Def. Sent. Mem. at 5. Smith does not even bother articulating, and cannot articulate, how the fact that he was a victim of a drive-by shooting should result in a lower sentence for drug-trafficking. In fact, the government submits that this fact militates in favor of a Guidelines sentence, assuming it is pertinent at all. After all, the PSR indicates that this event occurred on January 1, 2003 and it seems unlikely that it was a coincidence that just two days later, on January 3,

2003, Smith was found to have violated the terms of his probation and was ordered incarcerated for a year. PSR at ¶¶75 and 101.

      **(c) Defendant's Need for Educational or Vocational Training, Medical Care, or Other Correctional Treatment (18 U.S.C. §3553(a)(2)(D):**

Smith is interested in obtaining his GED and in working on his mechanical skills. PSR at ¶ 109. Therefore, it would appear that he would benefit from the educational and vocational programs available to inmates within the Bureau of Prisons. Unless Smith takes the position that his successful completion of an eight-month substance abuse treatment program adequately addressed his self-reported substance abuse problem, he may also benefit from the Bureau of Prison's 500-hour substance abuse program which would precede his release back into the community.

*   *   *

For all the foregoing reasons, the government respectfully submits that a sentence of 100 months' incarceration is both reasonable and necessary to comply with the purposes enumerated in

18 U.S.C. §3553(a)(2).

                                   Respectfully submitted,

                                   MICHAEL J. SULLIVAN
                                 United States Attorney

                         By:   *s/Patrick M. Hamilton/*
                                 Patrick M. Hamilton
                                 Assistant U.S. Attorney
                                 U. S. Attorney's Office
                                 John Joseph Moakley
                                 United States Courthouse
                                 1 Courthouse Way, Suite 9200
                                 Boston, MA  02210
Date: April 15, 2005            (617) 748-3251