| UNITED NATIONS | | **E** |
|---|---|---|

 **Economic and Social Council**

Distr.
GENERAL

E/CN.4/2000/NGO/18
1 February 2000

Original: ENGLISH

COMMISSION ON HUMAN RIGHTS
Fifty-sixth session
Item 6 of the provisional agenda

RACISM, RACIAL DISCRIMINATION, XENOPHOBIA
AND ALL FORMS OF DISCRIMINATION

Written statement submitted by Human Rights Watch, a non-governmental
organization in special consultative status

The Secretary-General has received the following written statement which is circulated in accordance with Economic and Social Council resolution 1996/31.

[30 December 1999]

GE.00-10480  (E)

E/CN.4/2000/NGO/18
page 2

1.      The impact of the criminal justice system on minority groups, particularly African Americans, remains one of the most important and disturbing human rights issues facing the United States.  Overwhelming data establish the strikingly disproportionate number of African Americans, relative to their share of the United States populations, who have been stopped by the police, arrested, convicted and sentenced for crimes.  On any given day, one in three young Black American males is either in prison or jail, on probation or parole.  This racial disparity exists even though United States criminal laws are racially neutral on their face, and police authorities insist that law enforcement, prosecution and sentencing are free of racial bias.  Federal and state laws also prohibit discrimination on the basis of race or ethnicity.

2.      It is no easy matter to determine whether and to what extent the racially disparate impact of the criminal justice system is the result of racial bias and discrimination.  Few honest observers would deny that the influence of race is very clearly seen in at least some areas of the criminal justice system.  It is blatant and intentional in, for example, the police practice of racial profiling - stopping men and women for questioning simply because of their race.  In the State of New Jersey, for example, Blacks were almost five times more likely as other drivers to be stopped by the police on the highway.  Some argue that infamous cases of police brutality against Blacks - the beating of Rodney King in Los Angeles in 1991, the rape of Abner Louima in 1997 and the killing of Amadou Diallo in 1999, both in New York - are only the more visible and horrific examples of pervasive racial bias in police practices.  Forty-three per cent of the 3,452 men and women on death row are Black and research has demonstrated that the race of both the victim and the offender counts heavily in the determination of whether a crime will be punished with death rather than life in prison.

3.      While the conscious prejudices of individual actors undoubtedly play a role in the criminal justice system, contemporary race discrimination in the criminal justice system is frequently subtle and diffuse, revealed particularly in patterns of racially disparate impact - and in their toleration by the White political majority.  Racial disproportions in the national prison population testify powerfully to the inextricable link of race and the criminal justice system.  Although Blacks constitute 13 per cent of the United States population, they comprise almost 50 per cent of the prison population.  African Americans have an eight-times-greater chance of being incarcerated than do Whites.   Although young Black men in their twenties and thirties constitute 2 per cent of the national population, they constitute one third of all admissions to prison; they are incarcerated at a rate 17 times greater than the national rate.  Thirteen per cent of Black men are disenfranchised because of felony convictions.

4.      Although race has been shown statistically to affect different stages of criminal prosecutions and certain sentencing outcomes, and although intentional racial bias is no doubt present in certain individual cases, wholesale race discrimination does not account for the shocking racial composition of United States prisons.  Most modern empirical analyses have concluded that factors other than race discrimination account for most of the disproportionate representation of Blacks in United States prisons.  With the conspicuous and critical exception of drug law enforcement, patterns of Black offending and Black criminal records account for most - although not all - of the disparity in incarceration rates.  For the past two decades, for example, Blacks have constituted between 43 and 47 per cent of arrests for violent crime - crime which is usually punished with prison sentences.

5.      Racially different patterns of crimes of violence and imprisonable property crimes are not, however, the sole cause of modern race disproportions in United States prisons. Since the onset of the "war on drugs" in the mid-1980s, Black Americans have been arrested, prosecuted, convicted and imprisoned for drug law offences at rates grossly out of proportion to their numbers among drug offenders. Although drug use and selling cut across all racial, socio-economic and geographic lines, law enforcement strategies have targeted street-level drug dealers and users from low-income predominantly minority urban areas. For a variety of reasons, it is easier to make arrests in these neighbourhoods as contrasted with, for example, suburban neighbourhoods with mostly White populations.

6.      As a result, although Blacks constitute an estimated 15 per cent of all drug users and both Whites and Blacks sell drugs, Blacks constitute 36 per cent of arrests for drug possession and half of all arrests for drug selling. Blacks entering the criminal justice system on drug charges have suffered the impact of the more punitive approach to drug offences that has prevailed since the mid-1980s. Harsher attitudes toward drug offenders and changes in drug sentencing, particularly the advent of mandatory sentencing laws imposing stiff prison sentences even on minor offenders, increased the proportion of arrested drug offenders who are sentenced to prison and the length of time offenders serve in prison. The chances of receiving a prison term following a drug offence arrest increased 447 per cent between 1980 and 1992. The cumulative effect of higher rates of arrest and imprisonment is the striking disproportion of the racial composition of imprisoned drug offenders. Fifty-six per cent of all drug offenders in state prison are Black. Nearly 40 per cent of all Blacks sent to prison have been convicted of drug offences. Between 1985 and 1995, the number of Black drug offenders in prison increased by 707 per cent; the number of White offenders increased by 306 per cent.

7.      In some states, the racial impact of drug control efforts is even more startling: in seven states, Blacks accounted for between 80 and 90 per cent of all admissions to prison on drug charges. In one state, Blacks are 39 times more likely to be incarcerated for a drug offence than Whites. In another, Blacks eligible for life sentences as repeat drug offenders were five times more likely to receive a life sentence than life-eligible Whites and received 98 per cent of all such life sentences.

8.      The much harsher sentences mandated under federal law for crack cocaine compared to powder cocaine offenders have also had a startling but readily foreseeable racially disparate impact. Although pharmacologically identical, crack is sold in smaller quantities and is much cheaper to obtain than powder; largely as a result, it spread rapidly among drug offenders in the late 1980s. Citing concern about the violence associated with the distribution of crack, the drug's allegedly higher addictive attributes and its effects on minority neighbourhoods, the federal Congress enacted mandatory sentencing laws that punished crack cocaine-related offences far more harshly than those related to powder cocaine. Although the prevalence of both crack and powder cocaine use is higher among Whites than African Americans (more than half of all crack cocaine users are White), 96 per cent of those prosecuted for crack possession and facing the higher crack sentences are Black or Latino. Higher arrest and prosecution rates for African American drug offenders and the long mandatory prison sentences imposed for crack cocaine offences in contrast to powder cocaine are a principal reason that Blacks account for 60 per cent of the federal prison population.

E/CN.4/2000/NGO/18
page 4

9.	Despite the abatement of the crack epidemic and the growing realization that the differential punishment for crack versus cocaine lacks scientific or social justification, Congress has refused to eliminate the sentencing differential.  Its unwillingness to act is influenced by "tough on crime" views that favour punishment as the response to drug use.  But many people believe it has more racially invidious roots as well - they suggest that Congress would never countenance a sentencing scheme that had as disproportionately harsh an impact on White communities.

10.	The racially disparate impact of current drug control efforts prioritizing criminal prosecution and harsh mandatory sentences raises serious questions about the willingness of the United States to meet its international human rights obligations.  The right to be free of discriminatory policies cannot be sacrificed to drug control strategies.  Elected officials and law enforcement personnel have a choice of strategies with which to protect communities and reduce drug dealing and drug abuse.  In choosing to prioritize arrests and imprisonment of drug offenders, the United States opted for policies that have had a devastating effect on Black communities.  Given the availability of alternative strategies that would not yield such egregious racial disparities, Human Rights Watch has concluded that current drug control policies are not only profoundly misguided and destructive, but reflect a failure in the past of the United States to honour its obligations under the International Convention on the Elimination of All Forms of Racial Discrimination and the International Covenant on Civil and Political Rights.

-----